Good morning. The first case we're going to hear is Emerald Coal Resources v. Hoy, numbers 14-4029 and 14-4736. May it please the court, I am R. Henry Moore, I represent Emerald Coal Resources, LP, and I have asked to reserve five minutes for rebuttal if I may. That would be great. This case involves a provision of the Mine Act, section 105C, that is an anti-discrimination, anti-retaliation provision. I think in looking at this case, I think you have to keep several things in mind. First of which is that under the Mine Act, it is not MSHA, but the operator that has the primary responsibility for the safety of the mine. And in addition, that the miners who work at the mine are under the act viewed as people who will cooperate in that endeavor. The Mine Act is a version of... You're not arguing that there's some problem with an employee, a union member, going through his union, right? We're not arguing that there's a problem with that, but that's... He can certainly do that, but it doesn't stop there. Because certainly he can go through his union, but you still... That's not where it stops. Where it's... As Commissioner Althon pointed out in his dissent, even if you go to your union representative and they raise it to MSHA, they raise it to the company, which Mr. David Moore, the union rep in this case, did not do, you still have to do an investigation. And in that case, if you do an investigation, you're entitled to the... If you're an operator, entitled to the information so that you can actually do an investigation. But does the Mine Act require complainants to identify the subject of their complaints, and where would it require that? It does not, in fact, require that under Section 103G. But, Your Honor, as I see it, 103G is just... In some ways, it started this whole process, but this goes far beyond anything in 103G. And, in fact, whoever made the 103G complaint, it certainly wasn't Floyd and Franks. Mr. Moore, I'd like to ask you a threshold question that I'd also like the other parties to address, and that is, how is there even properly a judgment before us and word of damages for us to review when, by my count, the only majority we have here is three commissioners that concluded that there was no intentional discrimination? Your Honor, I would agree with you. There was no intentional discrimination, and there was no intent to discriminate, and three of the commissioners said that. But the two commissioners, Jordan and Nakamura, still affirmed the ALJ. So in affirming the ALJ and thus joining with Commissioners Young and Cohen, they upheld the judge who imposed a remedy for the complainants. But assuming for the moment that we're talking about two separate and distinct causes of action for interference and intentional discrimination, what authority is there to cobble together two separate bases of liability to say that there's any majority here other than that there's no intentional discrimination? Would that were true, but they did, in fact, to use your term, cobble together an affirmance of the administrative law judge. If that does not constitute a majority, then isn't it the case that the only question properly before us is whether there's substantial evidence to support the majority decision that there was not intentional discrimination, and then we need to decide whether or not there's a basis for remand? I hadn't thought of it that way, Your Honor, to tell you the truth, because the judge lumped interference and discrimination into one. You mean the ALJ? The ALJ, yes. The ALJ really doesn't address interference other than to acknowledge that claim was made in footnote three. She acknowledged it and she said she considered in reaching her decision on discrimination. Now, of course, we have taken the position that interference isn't separate and apart from discrimination. It's not some separate cause of action. It is, as I see it, an illumination. Congress, in 77 when they did that, was clarifying what they meant by discrimination. They said, or otherwise interfere. And they were very, in their congressional report, they were pretty specific as to what they were thinking of. But it's really all part of the same. I don't see that it's a separate cause of action. And we didn't win. That's why we're here. And whether or not the commission could cobble together or not, but frankly because three of the judges said there was no intent to discriminate and three of the commissioners said we had a legitimate business purpose in conducting the investigation. The case should be over, but it should be over in Emerald's favor. I don't think... Before the commissioners said we violated the act, but for different reasons, didn't they? Essentially, that's what the majority said. Two of them said we violated it because we discriminated and two of them said we violated it because we interfered. Can I ask you, I'm going to ask Judge Krause's question in a slightly different way. When we normally review a district court decision, as you're probably aware, the appellee, we can affirm on any basis that's supported in the record. It's a little different with an agency. The Chenry case, the Supreme Court case from 1947, says that our review is limited to the rationale employed by the agency. It seems like there are two different rationales employed by the agency. How do we go about then reviewing what the agency did? You may not be the person to answer that. I may not be the person to answer it. Remember also the review commission is a separate independent adjudicatory body. But I think you can simply look at the fact that three said there was no intent to discriminate and three said there was a legitimate business justification. That being the case, I think that clearly means there is no violation of Section 105C. I don't think you can separate a so-called interference claim from an intent to discriminate. Five commissioners here disagreed with you and the commission has already crossed that bridge, hasn't it, with Moses and Gray? No, I don't think Moses and Gray really are. They're not like this case. I mean, Gray, I think, I mean, in Moses, as I recall, there was a distinct conversation about whether the individual talked to MSHA. And yes, he hadn't, but there was that in it. In Gray, the individual was subpoenaed or appeared before a grand jury and he had a conversation with a supervisor where the supervisor, jokingly or not, threatened to kill him. I don't think that's the same thing as what we've got here. But the other problem I have is this approach where you separate out intent. I think the language of Section 105C is clear and I think we need to be very careful in relying on NLRB cases. And the reason is there's a fundamental difference between NLRB and the Mine Act. NLRB presumes an adversarial relationship between the employer and the employees. The Mine Act does not presume that. In fact, it presumes a cooperative relationship. And frankly, that is necessary if you're going to achieve safe mines. That may be a good argument, but didn't the Commission already reject it in Gray? In Moses, it rejected the because of language as supporting that argument. I don't think, yes, they did seem to reject it, but the cases, as I see it, are distinguishable. I frankly think, as far as I know, this issue of whether or not you have intent, need intent with interference, and the intent, as I see it, comes from the because of language. The language, I think, is plain and there's no reason for deference or what have you. I think the Commission is clearly wrong in divorcing out intent. You're talking about an industry that you could say there's protected activity going on every day. We're talking about fire bosses, mine examiners here. What is their job? Their job is to identify hazards and write them in a book. You have people talking every day about there is no issue that doesn't somehow have some relationship to safety when you're talking about operating any kind of mine. Well, I think your friends might say we're all on the same page about safety. They may say this is about anonymity and whether they're required to divulge names. On page 19 of your brief, you talk about the Pasula case. You actually speak of encouraging people to talk, but it seems that you've expanded your argument to saying folks ought to be required to talk. What's the authority, really, that requires Hoy and Frank to disclose the name? Well, first of all, let us remember that they gave up their anonymity. They're the ones who said two months after the fact, apparently, that there's an issue with this. So there's an issue with this. This isn't 103G. This is an informer privilege. They've already said that there's an issue. There is an anonymity for them. That's what I see 103G is intended for. But, frankly, 103G doesn't apply here. But your view is because it doesn't have to do with the writing? You're limiting it strictly to the writing. No, it's not the writing. Long ago in this industry, AMCHA and everybody, well, AMCHA ignores the in-writing requirement. No, because 103G wasn't a complaint. It deals with a complaint made by the miners' representative. And as I see it, or a miner, and as I see it, the anonymity there is directed at the people who told the miners' rep, not the people who are committing the violation. What these folks over here are trying to do is shield whoever committed a very serious mine safety violation. Why would you do that? Ms. Moore, why, when we're looking at the question of pretax, the evidence in support of unintentional discrimination, why does your client need the names directly from Franks and Hoy? I understand the argument that you've made that the names alone are not sufficient. But on this record, where there was already a finding by AMCHA that the belts were dangerously dirty, it's clearly the job of the fire bosses to do those inspections. You have the information about the time from Moore's investigation, and so you could narrow it down to one or two fire bosses. Why isn't there sufficient evidence to take legitimate adverse employment action against those fire bosses without getting the names from Franks and Hoy? Well, let's take what we have. We have nothing from Moore and Franks. We have their supposed conversation with Dave Moore. And when he thought he knew what it was, and we can argue about what was told to Dave, but here's the thing, is Dave didn't see anything. Hoy and Franks apparently saw something. But AMCHA found violations. No, they found violations on the conditions they observed when they inspected underground. They didn't find a violation in the pre-shift, as I understand it. I'm sorry, so was it a different time that you were looking at to identify the fire bosses? Yes. Then those shifts where AMCHA found violations? When AMCHA did their 103G inspection, they came in and inspected every belt in the mine. And they wrote some violations, and we can, well, let's not get into what the gravity was because a lot of them were, quote, were known as non-significant and substantial. They didn't write a violation on what the pre-shift examination when Hoy and Franks said the violation occurred. We wouldn't be here. We would be fighting before the administrative law judges. But we don't have, yes, we have perhaps a date and a time from somebody who said I lied. We have the fire bosses, and recognize that these belts are split up oftentimes between fire bosses, so we don't have it specific. So we don't have, and we have the fire bosses who are theoretically the target of this denying it. Now, I guess the admiral made the mistake of assuming that there was some validity to the complaint. But if they're going to go in and discharge somebody for failing to do a pre-shift examination, which is undisputed on this record, this is a serious violation. You go in to an arbitrator, say, Mr. Arbitrator, Hoy and Franks told Dave Moore, who told us, and we suspected we knew, and Dave suspected he knew the fire bosses, and Dave said, no, I think they did the exam. The only people who were on that belt, theoretically, were the bad examiners. Are you just objecting on the basis that it's hearsay? Can't you go forward with just a name? No, you can't go forward with just a name. You can't investigate? Well, all right, say we investigate. What's there to investigate at this point? We have the pre-shift record that says they did the exam. We have the fire bosses that said they did it. We don't have any eyewitness or anything like that. And we don't have any concrete evidence that we can base a discharge on. Mr. Sweats was absolutely right when he said, if you took this to arbitration, you would lose. Let me ask you something. You say these are serious allegations. You repeatedly questioned the minors, but you didn't do that to Moore, did you? No, we didn't do it to Moore. Why not? I think, well, there's nothing in this record, Judge, about that. But, frankly, I think Moore said he checked it out and there wasn't anything. So you've got to go to the source of the information. And Moore would not know. He wasn't on the conveyor belt at the time. He doesn't have any information. And that's why you have to go to the source. And these two individuals said they had the information and they said they had documentation and they refused to produce it. But on this point, if you take Franks and White out of the equation, plenty of investigations are conducted and disciplinary action taken based on circumstantial evidence. Where you have belts that were sufficiently dirty that they incurred a violation from AMSHA and you know who inspected those, which fire bosses were on the schedule for inspection. Even if you don't have anything about Hoy and Franks in the picture, why wouldn't that be sufficient to take disciplinary action against those fire bosses? First of all, the inspections on September 22, 2011, under the 103G, weren't about the time period that Hoy and Franks said the violations occurred. All we know from what the conditions of the belts were, sometime in late July apparently, was the pre-shipped examination records. And they would tell us what the conditions were. And that is not sufficient. You don't have what occurred on September 22, what the belts looked like. It doesn't tell you what the belts looked like in late July. Because, for example, those belts are pre-shifted three times a day, seven days a week, and we have beltmen assigned to clean them. We run coal all the time. If what was there in July is still there in September, we're not doing our job, and I don't think that's the case. All right, thank you. Time's up. We'll get you on to the bottom. Good morning. Good morning. May it please the Court, my name is Laura Carr. I'm an attorney for the United Mine Workers, and I'm here today representing Mark Franks and Ronald Hoy. I will be presenting argument in support of affirming the discrimination findings in this case. Ms. Carr, can you start with the question that I asked your colleague, and then I'll turn it over to you. Sure. And that is, how can we be affirming when there is not a single rationale that gathered any majority in the commission? I think the answer to that lies in what Commissioner Jordan and Commissioner Nakamura's mention of the discrimination findings looked like. They said in their opinion that they didn't feel that those findings were supported by substantial evidence in the record. They didn't identify a single one of the ALJ's factual findings as not being supported. But we have to review the rationale of the commission, and no two commissioners can bind the commission. So other than a majority concluding that there was not intentional discrimination, what rationale of any majority are we reviewing? Well, as I understand it, this Court is entitled to make de novo legal conclusions from the facts that are coming up before it. And the facts that we're still dealing with in this case are the findings of the ALJ, because none of the commissioners questioned those facts or made any new factual findings. But we're not permitted by the Supreme Court in Ventura and our case law in Conan to review any rationale other than that that is presented in the agency's decision. And here where we've got a split of 2-2-1 with completely different approaches,  how is there an award of damages? Well, as I was alluding to, it's founded in the factual record that came out of the ALJ decision. Those facts were not disturbed on commission review, and those are the facts that we're still working from here. And this Court is entitled to look at the commission's decision, including both the discrimination and the interference violations and reason itself. Judge Krause's point and my point talking earlier to your friend, what do we review exactly? I understand we have two favorable opinions, but neither is the majority. So what exactly are we supposed to be reviewing? Well, what we're reviewing is the findings. I understand the facts, but what about the rationale? What we're reviewing is the finding that Emerald committed a violation of the Mine Act. Now, you're right that you have kind of two different trains of thought coming out of the commission, but you do have four to five commissioners agreeing that a violation occurred. Now, given that majority finding and given the kind of split rationale of getting there, we would submit that it's up to this Court to determine where that violation was if, in fact, the Court finds a violation. What authority is there in agency law for us to cobble together two votes from column A and two from column B to say that there's a majority? If we had a special verdict form and a jury was unable with the majority to reach any basis for liability, say half the jury found sex discrimination and half found race discrimination, would you say, well, if you put them together, there's a basis for Title VII liability? Well, this is kind of an unusual situation. It might be a bit of a novel situation coming out of Mine Act law, but what I think the salient point here is that four out of five commissioners did find that Emerald committed a violation of the Act when it's disciplined these complainants on inappropriate grounds. I have not fully briefed the issue that you're mentioning. Yeah, I'm sorry about that. It hasn't been briefed yet, so I know this is a bit of a surprise, but still it's a concern. Yes, I understand that. What if we agree with a majority that did find that there was not substantial evidence supporting intentional discrimination? Under those circumstances, would you agree that we then need to remand for the commission for some majority to address one way or the other the question of intentional interference? Well, I believe counsel for the Secretary of Labor is going to address that more fully, and we would support his position on that. But as I understand that issue, if this court does not find that discrimination exists and we would support remand on the interference claims to the commission, we can see that a majority of the commissioners did find that there is cause of action that arises in this case for interference, and we would support their further consideration of those issues. Thank you. You know what, for both sides, because we kind of threw this at you, the court requests from the parties a letter within, say, five days, not to exceed five pages, dealing with the issue of what we're supposed to do with a 2-2-1 split. You know, can we review that? So to give you a chance to do a little research on it and give us some briefing, okay? So they're both due at the same time, so that can be a reply, okay? So within five days, is that adequate? Yes. We'll give you seven days. Okay. And I'm feeling really, you know, and maybe five pages. Thank you for your generosity. And no longer than five pages, okay? Thank you. Yes. So we actually have two commissioners that found in favor of interference, but if you look at even those three that addressed interference, those two and the dissent, there's disagreement on what the nature of an interference claim is. They may agree that the intent to discriminate isn't required, but as to whether narrow tailoring is required, and that's something that needs to be evaluated, there's not agreement there. So you had argued in your briefs that we should affirm on interference grounds, but we need the commission to address what the elements and scope of an interference claim are in the first instance, right? Yes, and at this juncture, given the argument that I anticipate counsel for the Secretary of Labor is going to make, that is something that would be amenable to us to remand on those issues, if that's what the court decides to do. Okay. So let's talk again about the intentional discrimination prong of this. Why isn't it the case, given PAC and given just the nature of employment generally, when an employee refuses to cooperate in an employer's internal investigation into wrongdoing, much less life and death safety issues, the employer is entitled to take disciplinary action. Why shouldn't that apply even more so when you're dealing with safety issues and a mining act that, in its text, puts that primary responsibility for safety on the miners as well as the operator? Well, to answer the second part of your question first, in the Mine Act, Congress is expressing a concern with encouraging miners to report safety hazards as freely and as often as possible in service of broader safety goals in the mines. And Congress understood that a miner who, in making such a report, is called upon to name the name of a coworker allegedly responsible faces not only the ever-present risk of retaliation from management that always floats over any miner's safety report, but also can anticipate having substantial difficulties with coworkers. It makes it difficult to get the job done, difficult to get along. But they did disclose it, though. I mean, they did disclose the names. I mean, they did tell their union rep, right? They did. And I think that emphasizes the type of confidentiality that the Mine Act is meant to deal with. A miner can expect a degree of confidentiality from a union representative that he cannot necessarily expect from the operator. And that's why 103G presents that congressional intent of not having the operator have access to the names of these accused coworkers. You're not arguing that your clients here made the 103G complaint. You're asking us to take the anonymity, that protection that's provided in the specific circumstances in statute in 103G, and to apply that as a general matter to say that there is a right not to disclose names outside of the 103G context. Isn't that contrary to the text of the statute? We would submit that it is still within the 103G context. These miners did make a safety complaint to representatives from MSHA. It's an oral complaint, which we've established is covered by 103G. And because they made that complaint to MSHA, they have the right under 103G to not give the name of that accused coworker in their complaint so that Emeril doesn't wind up with it at the end of the day. Now, the circumstances in this case are a little bit unique in the fact that the operator inserted itself into those meetings with MSHA and found out about those safety reports pretty much as they were given to the inspectors. But the fact that Emeril did that and the fact that there wasn't the usual time lapse between the time the miners made the report and the time that Emeril found out about it doesn't mean that the miners can be compelled under those circumstances to later answer Emeril's questions about that fire boss's identity when if things had proceeded as they normally do from making a complaint to MSHA that is then transmitted to the operator, that information would never make it to the operator. Well, 103G provides very particular procedures for how that type of complaint that retains anonymity would go forward. And your clients didn't take advantage of that here, right? They did. They acted how Congress and the Mine Act would expect them to act. When they saw a hazard, they reported it to MSHA, and they tried to do that while keeping confidential according to their 103G rights, the name of the accused miner involved. Now, the fact that there were some unique circumstances about this case and as far as where management was when these complaints were being made doesn't change the general congressional policy expressed in 103G that operators are not supposed to get the names of miners who other miners accuse in their safety reports. The operator here didn't engage in any wrongdoing to secure the information about their disclosure of the name. That was brought to them by the MSHA representative, correct? That's really not even the relevant point in what I'm trying to express is that 103G is supposed to protect miners in the sense of keeping the operator from getting the name of an accused co-worker. That's the congressional purpose. The fact that it wouldn't make any sense to provide this protection if Emerald could later go and question the miners directly about information that shouldn't have been a part of anything that Emerald received as part of a safety complaint to begin with. But how do they investigate if they don't have a name? I mean, it's a needle in a haystack then. It could be any shift, any day. You have no idea. Well, those aren't the facts that we're dealing with here. I mean, the mine, Franks and Hoy gave the union safety committeeman enough information about the day that this happened, the shift that it happened on, where it happened, that the committeeman himself was able to figure out who the miners were talking about. But doesn't the employer have an interest in safety in their shop? I mean, how are they supposed to investigate on their own? Or they're not supposed to? No, they absolutely are supposed to investigate. And Emerald had a lot of avenues to do that that did not involve demanding the fire boss's name from Franks and Hoy. But Franks and Hoy are the only ones that have firsthand information. The operator, you'd agree, if there is wrongdoing and there's a fire boss who's putting the lives of miners in jeopardy, then it's appropriate for the operator to take disciplinary action against that fire boss, right? Yes, it's absolutely appropriate. But we would reject the idea that the only way to take that action is to have that firsthand testimony from Franks and Hoy. But you're representing the union. The union representative himself said that if there had been disciplinary action taken against a fire boss without direct evidence, just based on a name that was via hearsay, that he would have filed a grievance, that that would have been an unacceptable action on the part of the employer. Well, to clarify, I'm not here representing the union today, despite the fact that I'm employed by the union. I'm here representing Franks and Hoy themselves. I understand. And I understand the union official's perspective on that. But if this issue wound up in front of an arbitrator, all Emerald would need to argue is, look, these are the facts that we had available through the legitimate investigatory processes we were able to undertake, which one would expect would include questioning the union safety committeeman about who he suspected and who he investigated, would include following up on the safety committeeman's investigation, asking about the details of that investigation to see whether he had reached the correct conclusion, and talking to any number of other people who might have information. All of that information can then be presented to the arbitrator, and if the arbitrator were to turn around and ask, well, who actually saw this? Where are those people? Emerald could make the legitimate argument that under 103G, they were prohibited from demanding from eyewitnesses whether this fire boss, who's now up for discipline as a result of this arbitration, was the one who they saw. Is an operator prohibited from asking for that information whenever it comes to their attention, that there's an allegation of wrongdoing against a co-worker? For example, let's take out of this equation and how the disclosure came to be known by the operator. Say that there's one co-worker who complains to another, and that minor is so concerned about the nature of the safety violation that the second minor goes to the operator and says, you know, I don't have firsthand information, but you may want to talk to my colleague, because he saw something that I think puts us all in jeopardy. Are you saying that under those circumstances, the operator can't go to the first minor and ask, even ask repeatedly, for the information necessary to protect safety? No, that's not what we're saying. That's a very different situation when a minor either comes forward to the operator themselves or the operator approaches a minor and asks about a safety hazard. That's a different situation when a minor makes a complaint to MSHA about a hazard that they've seen. Under the first circumstance, there's a minor who approaches the employer, obviously has a decreased expectation of confidentiality. A minor who is approached by the employer and has information should have made that complaint to MSHA in the first place. But a minor who approaches MSHA does so with the knowledge that the Mine Act provides certain protections, and you can see that in the record. The complainants talked a lot about the confidentiality they expected to have as a result of the specific hazard reporting techniques that they employed. A minor who goes through that avenue expects a certain level of confidentiality to certain details about their complaint, and that's exactly what 103G gives them. The fact that these minors reported through MSHA makes a substantial difference here. Isn't the communication at issue not to Moore or MSHA, but the group meeting where Hoy and Franks agreed to have management present where they disclosed the fact that they did have the information as to who it was and the time and even documentation, but that they were not willing to disclose the specifics of that? Well, that still counts as making a safety complaint to MSHA. The whole point of the meeting was for Franks and Hoy to speak with the MSHA representatives and to make that complaint. So 103G's protections would still attach under those circumstances. But they didn't ask management to leave. In fact, they consented to management being present. Given the circumstances, though, that really can't be considered a knowing waiver of any kind of right. It doesn't reflect any understanding on the minor's part that they knew that they had the opportunity to object. And both minors testified to this fact that they'd never been involved. Didn't the meeting say you don't have to have management here? Weren't they advised that management could be thrown out of the room? It's my understanding that the only question put to them was, are you comfortable with everyone here? I do not believe that they were advised that they had the right to object or could ask management to leave. And given their lack of experience with safety investigations and the general kind of power relationship between management and the minors, I don't think it's reasonable to conclude from their agreement under those circumstances that that was a genuine assent to management's presence. They also had a union representative present, isn't that right? They did have one. There have been kind of internal political difficulties attaching to this case in the sense that the union president, he testified to this at the hearing, was really there primarily interested in protecting the fire boss's rights, not in looking out for Franks and Hoy. So any kind of protective effect that you could attribute to his presence, I think, is severely limited given his own admitted conflict of interest in what was happening there. All right. Well, thank you. Thank you. Let's hear from your friend now. Good morning. May it please the Court. Samuel Lord on behalf of the Secretary of Labor. The Secretary appears before the Court today in two limited roles. The first role is as a party respondent in the trailing docket that's a civil penalty docket. We explained in our very short brief the reason why the Secretary is required to propose all civil penalties under the Act, and it is the Commission who actually assesses the final penalty. And we always appreciate short briefs. Well, that one was my shortest of record. I would like to hear your position on the question that Judge Krause has raised. Does this mean that any time, even though the vote was to uphold 105C, any time the rationale is different that we're without jurisdiction to review, what would your position be on that off the top of your head? It's not something that we briefed either. If able, as amicus, or as party respondent in the trailing brief, to also be given leave for the Court to file, I would like to do so. Strictly for information reasons, not as argument, some of the relevant statutory provisions might be 113D of the Act, which sets the contours of Commission review. The Commission is to review the ALJ's decision for substantial evidence. And then Section 106A of the Act establishes the boundaries of circuit court review of the Commission decision, and that's also whether or not substantial evidence supports the ALJ's determinations. I know of a D.C. Circuit case from 1983 where they interpreted those provisions and applied it in a 105C context. It's the Phelps-Dodge decision at 709F2-86. I'm sharing that for information purposes only, kind of as a warm-up because I think we'll all be able to brief this more fully. As the party respondent in the civil penalty docket, our position is that if the Court were to affirm the ALJ's finding that the reasons proffered by the company for taking its actions were discriminatory, that they were pretextual, that this Court should therefore affirm the discrimination finding and affirm the $40,000 civil penalty. We're not taking a position on the merits, but if this Court were to affirm the merits determination, then we would ask that the $40,000 civil penalty be affirmed as well. The parties have stipulated to the propriety of that penalty if the Court were to affirm the violation. The second role of the Secretary today is as amicus in support of neither party in the underlying docket. We are not taking a position, again, on the merits of either the discrimination or the interference claims before the Court. We're taking a position only to the extent the Court reaches issues related to interference. I think for the reasons that Judge Krause has already indicated, this case is more appropriate for remand on all issues pertaining to interference instead of this Court attempting to construe and apply the interference language in the first instance where the agency hasn't done so below. The ALJ made no findings regarding interference. She did not consider the case under an interference framework. Two of the commissioners abstained from addressing interference, so there's really nothing for this Court to review on that issue. Haven't the basic parameters that are at issue already been decided by the commission? That is, the interpretation of the statute, whether there's a requirement of discriminatory intent in Gray and Moses, whether the because of language is dispositive on that issue, and the totality of circumstances sort of standard. If that has already been set by the commission, then why can't we then address it? Yes, the commission has indeed in those cases indicated all of those basic parameters that you've just stated. The Secretary has an interpretation of the interference cause of action, which is stated on page 8 of our amicus brief, which we believe conforms with that commission authority. The two commissioners who did address interference in the case and applied it to find a violation did expressly endorse the Secretary's reading of the statute. Obviously, if this Court wishes to endorse our reading of the statute, that makes it easier for us. However, as a matter of procedural propriety, it might be best for the commission to more squarely consider this in the first instance. And isn't it the case under Brand X, even if we did, even if we undertook the interpretation of an arguably ambiguous statute as to what the elements and scope of that claim is, that wouldn't be binding on the commission. The commission could take a different view, and we would be bound by that in the future. Yes, I should say that we, in the mine safety context of the Mine Act, it's an unusual administrative statute because it divides the enforcement prosecutorial duties from the adjudicatory duties. And where you have a split enforcement and adjudicative role, deference is due to the interpretation of the enforcement agency, and that's Emsh in this case, not the commission. That stems from the Supreme Court's decision in Martin v. Osherick, and that is indicated in my brief. Can you address the question whether the commission has ever held that there's a statutory right to name your co-worker in a safety investigation outside of the MWNA 3G context? Is that not your issue? It's not my issue, so I really don't have authority to address it. If the court would like the Secretary's view on it, perhaps I could do supplemental briefing and see if we're able to provide a view on that issue. Would you agree that assuming we conclude that there is substantial evidence supporting, again, the three commissioners who found there was not discrimination, and we then are looking at the question of intentional interference, we can at least address the threshold question whether there is a separate cause of action under the statute before remanding for the commission to discuss the parameters of that cause of action? That is something that four commissioners, at least four, I think the fifth commissioner's opinion can also be read to recognize that there is indeed, as a threshold issue, some cause of action for interference under the statute. And as you look at the terms of the statute, not only did Congress, when it amended the statute in 1977, specifically add this anti-interference language into 105C1, it also amended 105C2 and 105C3 of the Act to authorize the Secretary of Labor or individual minors bringing their own private right of action to file with the commission complaints of discrimination or interference. I think that that language and the use of the disjunctive or is strong evidence that Congress wished to establish an interference cause of action. In addition to that, we have the legislative history. This comes from the Senate committee, the committee that drafted this language. It's the type of legislative history that this Court has said is deserving of the greatest amount of attention, and they say that it is the intent of the committee to prohibit not just discrimination but also forms of interference, including threats of reprisal or promises of benefit. So they use the word interference as a separate action. And then just to add on to that, those specific forms of interference, threats of reprisal, promises of benefit, are well recognized under the National Labor Relations Act. In fact, the NLRA Section 8C actually expressly references those forms of prohibited interference. So, yes, you could, before remanding, confirm the opinion of the Secretary and the five commissioners that there is some sort of cause of action for interference in the act. Wouldn't we have to first determine that we have jurisdiction before we could reach that issue? Yes. Okay. Anything more, counsel? No, if there are no further questions, I'll rest on my brief. It may be helpful, as I think Dave Andrews's question points out, when the parties are addressing the question of putting together different rationales in support of a judgment, what the consequence is for our review. Is that something where there simply is a plurality, it's not a majority for us to be able to address, again, other than a majority of three that found there was non-intentional discrimination here? Or does it actually deprive us of jurisdiction to move forward? Because it would seem the consequence of that, if we truly didn't have jurisdiction, would effectively affirm leaving in place the only majority rationale that there was not discrimination, rather than providing the commission the opportunity to address the claim of intentional interference, what the law is and how that law applied to the facts here. When you're doing your briefs, you might want to take a look at one of our cases, Cumberland Coal Resources versus Federal Mine Safety and Health Review Commission. It's at 515 F. 3rd, 247. It's one of our decisions, 2008. You might want to take a look at that. Okay, thank you, counsel. Thank you. Mr. Moore? Yes, just several points if I may. First of all, on the interpretation of 103G. The intention of 103G and its confidentiality provisions cannot be to protect minors who are committing misconduct. Clearly what that is, is if a 103G complaint is filed by a minors representative, it's to protect the names of the people who came to the minors representative, the so-called informants. It would be contrary to the purpose of the act to protect people who are doing things improper. Excuse my lack of an adverb there. Improperly. Second thing, if I may, this whole thing about interference. First of all, I don't think you're deprived of jurisdiction, because 106A says when a party is adversely affected by a decision of the commission. We are adversely affected. You have jurisdiction. You may choose to remand, but I believe you have jurisdiction. You are not deprived of jurisdiction. Otherwise, we would be deprived of our right of appeal. Second of all, in terms of this interference, we need to back up for a second. We have two commissioners saying there was interference. One saying there wasn't. And I think we need to look at what happened. It doesn't include what happened on the Imsha watch. Hoy was interviewed twice, Franks three times. The third time was because he raised something at the end of his interview. And the third time was the one where they got disciplined. They were given a last chance. These were not, as Commissioner Alston said, there is no indication of yelling, screaming, threats, intimidation. They simply asked the question. Yeah, but being called in that many times, is that somewhat intimidating? They were called in once in the operator's investigation. Then they were called in a second time where they got the discipline. I don't think that's inherently intimidating. The Secretary talks about closed-door meetings. We all know that if you're going to interview people in an investigation, you don't want the door open so everybody walking by the conference room can hear what's going on. Simply put, there just simply isn't anything here that says, you know, they didn't give, they didn't yell at them, they weren't hostile, they just simply asked them the question. And it's a legitimate question, as three of the commissioners said. Finally, I will note, while the UMW Council mentioned Mr. Sweat's and how there might be political issues, recognized in each of these interviews, the individual had their self-selected UMW rep. They picked, not Mr. Sweat's, not Mr. Plasky, who was the walk-around on this inspection, but they had a union rep. And when they talk about, well, this was our first investigation, recognize that throughout all of this, they have taken what I think is a nuanced approach to 103G, and yet, oh, we didn't know. Ms. Finster-Moore, does this case boil down to whether the complaint, the way that this came to the attention of the operator, was a complaint under 103G or not? No, it does not, because the 103G complaint, in a sense, is irrelevant. Yes, it triggered Amish's investigation, but they didn't make the complaint. They have never suggested they made the complaint, nor have they suggested they were people who gave the information to the person who filed the 103G complaint. But that's because you're looking at the 103G complaint as one specific event. As we've heard, the approach that your colleague is taking is that 103G complaints are much broader than that. It's complaints that are raised, even with MSHA, fall under 103G, whether or not they're in writing, whether or not they comply with the specific provisions of the statute. Do you agree with that? No, I do not. I do not think their actions are protected under 103G. Remember, they answered questions of an MSHA inspector. They never came forward to the company or to MSHA until MSHA said, well, have you ever noticed this? This was MSHA's investigation, then it became the company's investigation. To suggest that it's somehow protected by 103G, I think it's really stretching 103G. Would you agree if this was unquestionably a 103G complaint, reduced to writing, following the procedures in the statute, and somehow that was left out, somehow came to the attention of the operator, that it would be a violation then to be pressing for disclosure of the name, that anonymity would apply if that was the specific complaint we were dealing with? If it were a written 103G, and of course this started with a written 103G, that said, for example, Hoy and Franks told me about this, and it came to the attention that Hoy and Franks were named in the 103G complaint, that they're entitled to some protection, but I think at some point you have to take into account that you have to be able to do an investigation, and that's what this case is about, whether you're going to be able to do an investigation. Let me finish my answer on this, and I know I'm out of time. If whoever filed the complaint said Joe Blow and Sam Smith didn't do this exam, they aren't informants. I know they did it, and that's why I'm complaining. I don't think there's 103G protection for those two names. So what is the authority, if the crux of the matter is whether the disclosure to MSHA, whether that complaint constitutes a 103G complaint or not, whether it gets those protections of anonymity or doesn't, what authority do you have on that point? Well, I have the authority of the language of 103G, which clearly isn't talking about what these individuals did. They were interviewed in an investigation. They weren't complaining to MSHA. They answered questions in an investigation by the answering completely, of course. I don't think that gives them 103G protection. Are you aware of any case law in question? No, I'm not aware of any case law in question. Let's take, and I apologize for the time, let's take the situation. MSHA doesn't let anybody in that room but Horry and Franks. Horry by himself, Franks by himself, maybe with a rep. And then MSHA writes a citation for pre-shift violation. Emerald challenges it. There is informer privilege under the commission's rules. But they go to Horry and they say, okay, when did this occur and what proof MSHA do you have that it occurred? Oh, these people who we won't name. Well, obviously, even though the commission permits hearsay evidence, obviously that's not reliable and probative evidence as the commission contemplates. I have one question, if I may. Usually the court asks the questions. Yes, but it is a question, is the seven days calendar or working? What's that? Are the seven days for? Well, that's why I thought it would give you calendar. I just wanted to make sure. All right. Well, Judge VanAnderwerpen, do you have any other questions? I do not, sir. Thank you. Okay, great. Do you have a citation you mentioned, the informant privilege? Where does that trace to? It's in the commission's rules, which are, I can't cite the specific rule, but it's 2700, pretty clear for 2700, and I'm not sure what one, but I can provide that site when we provide our brief. Specifically, and there's commission case law about the informant's privilege. Thank you, counsel. Thank you. We'll take the case under advisement. I want to thank counsel for their excellent briefing and argument, and if counsel is amenable, we'd like to greet you and thank you.